SIGNED: August 10th, 2021
THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.

_____
Paul M. Black
**UNITED STATES BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TARA RETAIL GROUP, LLC<br>    Debtor. | Case No. 1:17-bk-00057 |
| U.S. BANK, NATIONAL ASSOCIATION,<br>as Trustee for the Benefit of the Holders<br>of COMM 2013-CCRE 12 Mortgage Trust<br>Commercial Mortgage Pass-Through Certificates,<br>    Plaintiff, | Adversary Proceeding<br>No. 1:18-ap-00010 |
| v. | |
| TARA RETAIL GROUP, LLC,<br>    Defendant, Cross-Plaintiff<br>    and Third-Party Plaintiff, | |
| v. | |
| COMM 2013 CCRE12 CROSSINGS MALL ROAD,<br>LLC and WELLS FARGO BANK, N.A.,<br>    Third-Party Defendants. | |

## MEMORANDUM OPINION

This matter comes before the Court on the motion of U.S. Bank, N.A., as Trustee for the benefit of the holders of COMM 2013-CCRE12 Commercial Mortgage Pass-Through Certificates ("U.S. Bank"), Wells Fargo Bank, N.A. ("Wells Fargo"), and COMM 2013 CCRE12 Crossings Mall Road, LLC ("COMM 2013") (collectively, "the Bank"), for summary judgment in their favor on Counterclaim and Third-Party Plaintiff Tara Retail Group, LLC's

("Tara") Third-Party Complaint and Second Amended Counterclaim pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Tara contends that the Bank breached a fiduciary duty owed to it by withholding funds for the requested repair of a culvert bridge. The Bank maintains that a fiduciary relationship between a creditor and debtor is not generally recognized in West Virginia, and that one did not exist here. The parties briefed the motion and counsel gave oral arguments on June 23, 2021. At the conclusion of the hearing, the Court requested additional briefing on several issues and took the matter under advisement.[2] The parties filed supplemental briefs[3] and the matter is now ripe for resolution.[4] For the reasons set forth below, the Court will grant the Bank's motion for summary judgment and dismiss the remaining Counts III and VI.

---

[1] Tara filed its Third-Party Complaint and Second Amended Counterclaim against COMM 2013 CCRE12 Crossing Mall Road, LLC and Wells Fargo Commercial Mortgage Servicing on July 20, 2018. AP ECF 72. Then on August 10, 2018, Tara filed its Amended Third-Party Complaint and Third Amended Counterclaim against COMM 2013 CCRE12 Crossings Mall Road, LLC and Wells Fargo Bank, National Association. AP ECF 82. Despite a few minor word changes, the only difference between the two documents is the change in name to Wells Fargo Bank, National Association. No pleadings were specifically filed in response to the Third Amended Counterclaim, however an Order was entered on December 22, 2020 that granted Tara's motion to substitute Wells Fargo Bank, N.A. for Wells Fargo Commercial Mortgage Servicing as the third-party defendant in this adversary proceeding. The pleadings in this case, including the summary judgment motion, seek dismissal of the Third-Party Complaint and Second Amended Counterclaim. Therefore, any reference in this Opinion will be to the Second Amended Counterclaim filed at docket number 72.

[2] United States Bankruptcy Judge Paul M. Black, Western District of Virginia, sitting by designation.

[3] Tara filed an objection to the Bank's filing of additional evidence in conjunction with its supplemental brief. AP ECF 273. Because the Court has not relied on any matters Tara perceives as "additional evidence" filed with the Bank's supplemental brief, the Court overrules the objection as moot.

[4] The Bank filed a motion to seal certain documents attached to its supplemental brief. AP ECF 270. Tara objects to the sealing of such documents. AP ECF 277. The Court grants the Bank's motion to seal certain portions of its supplemental brief on an interim basis. The Fourth Circuit has established procedures to be followed in the use of sealed documents on summary judgment. *Rushford v. New Yorker Mag., Inc.,* 846 F.2d 249, 253–54 (4th Cir. 1988); *Level 3 Communications, LLC v. Limelight Networks, Inc*., 611 F.Supp.2d 572 (E.D. Va. 2009). Absent a submission within twenty-one days that meets the substantive requirements set forth in *Rushford* and its progeny, all sealed documents submitted in support or opposition to summary judgment will be made publicly available on the docket.

# FACTUAL BACKGROUND

Tara is a Georgia limited liability company. AP ECF 72-2, p. 6. Its two members are William and Rebecca Abruzzino. *Id.* Tara owns the Crossings Mall in Elkview, West Virginia, a multitenant commercial property spanning about 200,000 square feet. AP ECF 117, p.2. There is only one public access point—a culvert bridge over Little Sandy Creek—to the Crossings Mall. *Id.* This litigation arises out of the destruction of that bridge due to a catastrophic flood.

The lending relationship between the parties began in September 2013, when non-party UBS Real Estate Securities, Inc. ("UBS") lent Tara $13,650,000.00. AP ECF 117, p.2. The Bank describes the loan as a commercial mortgage-backed security ("CMBS") loan, a specialized type of loan secured by commercial property, contributed to a securitization (*i.e.,* a trust), and serviced by various entities. This was Mr. Abruzzino's third CMBS loan. AP ECF 220, Ex. O, pp. 55-56. In connection with the loan, Tara executed several documents in UBS's favor: (i) a $13,650,000.00 Promissory Note; (ii) a Loan Agreement; (iii) an Assignment of Leases and Rents ("ALR"); (iv) a Cash Management Agreement; and (v) a Deed of Trust and Security Agreement pledging the Crossings Mall as collateral (collectively, the "Loan Documents"). UBS eventually assigned the loan to U.S. Bank, who ultimately assigned the loan to COMM 2013, the current holder. AP ECF 117, pp. 2-3. Wells Fargo is the master servicer on the loan and administers various escrow accounts. *Id.* at 3.

Pursuant to the Loan Documents, the Crossings Mall tenants made payments directly to Wells Fargo, who then segregated those funds into various escrow accounts. *Id.* One of these was the Capital Expenditure Account, which received monthly deposits of $3,493.62. AP ECF 72-1, Loan Agreement, Section 6.4.1. The Loan Agreement earmarked these funds for capital expenditures in the approved annual budget or for capital expenditures expressly approved by the

lender, the approval for which "shall not be unreasonably withheld or delayed." *Id.* Section 6.4.2 of the Loan Agreement provided a set of conditions Tara needed to satisfy for a disbursement of the capital expenditure funds, including the lack of an event of default that remains outstanding and submitting a certificate signed by an officer confirming that all expenditures requested to be funded have been completed. *Id.* at Section 6.4.2.

This controversy centers around a disbursement request that was not fulfilled. In January 2016, Tara's property manager emailed Wells Fargo to request $24,000.00 to replace the culvert and repair a dirt cliff behind a tenant's store. AP ECF 72-3, p. 1. The email warned that "[i]f these issues are not resolved immediately the only entrance to the center could collapse." *Id.* Though Tara requested a disbursement from Wells Fargo, the Loan Agreement required Tara to provide an Officer's Certificate that the work had been completed before the Bank was obligated to release Capital Expenditure Funds. AP ECF 72-1, Loan Agreement, Section 6.4.2. Tara did not furnish an Officer's Certificate and admitted that it completed no repairs before requesting disbursement of the Capital Expenditure Funds. AP ECF 117, p. 7. Ultimately, Wells Fargo did not disburse the requested funds.

In June 2016, a catastrophic "one-in-a-thousand year" flood swept through West Virginia and destroyed the bridge, rendering the Crossings Mall inaccessible to the public for over a year. AP ECF 117, p. 3; *See also* https://www.usatoday.com/story/news/2016/06/24/2-dead-floods-sweep-west-virginia/86329316/ (last accessed July 29, 2021). Tara failed to make required loan payments after the flood. AP ECF 72-2, p. 8.

On September 28, 2016, U.S. Bank filed a complaint against Tara in the United States District Court for the Southern District of West Virginia alleging breach of contract under the Loan Agreement. AP ECF 1. In response, Tara filed its defenses, answers, and counterclaim, as

amended. AP ECF 14, 28. After the Bank filed a foreclosure notice, Tara filed Chapter 11 bankruptcy with this Court on January 24, 2017. Tara then moved to refer the counterclaim from the district court to the bankruptcy court of the Southern District of West Virginia, as Tara listed the counterclaim as an asset of the estate on Tara's Schedule A/B. AP ECF 55. On March 12, 2018, the district court referred the counterclaim to the Bankruptcy Court for the Northern District of West Virginia. AP ECF 66. On July 20, 2018, Tara filed its Third-Party Complaint and Second Amended Counterclaim, asserting the following claims against the Bank: (I) Breach of Contract, (II) Breach of Duty of Good Faith and Fair Dealing, (III) Breach of Fiduciary Duty, (IV) Tortious Interference with Business Relationships, (V) Punitive Damages, (VI) Action for Accounting, and (VII) Declaratory Judgment. AP ECF 72. The Bank then moved to dismiss the counterclaim. AP ECF 86. By Memorandum Opinion and Order of this Court, all claims against the Bank except for two were dismissed: Count III (breach of fiduciary duty) and Count VI (action for accounting).[5] AP ECF 117, 118. These two counterclaims remain before the Court. The Bank has moved for summary judgment and asks the Court to enter judgment in its favor on Counts III and VI in the Third-Party Complaint and Second Amended Counterclaim. The Bank asserts (1) that Tara's breach of fiduciary duty claim is barred by a contractual liability limitation, (2) that Tara cannot prove the essential elements of its breach of fiduciary claim as it cannot prove that the parties had a special relationship or that the alleged breach of any fiduciary duty caused Tara any harm, and (3) that Tara cannot prove the essential elements of its claim for an accounting as Tara cannot prove that the parties have a special relationship or that the Bank has not accounted for amounts due and owing under the loan at issue.

---

[5] The Honorable Patrick M. Flatley, United States Bankruptcy Judge, now retired.

## **JURISDICTION**

Normally, the recitation of the Court's jurisdiction in such matters is straightforward. Such is not the case here. Even though this matter is pending in the United States Bankruptcy Court for the <u>Northern</u> District of West Virginia, Tara initially moved to refer its counterclaim against the Bank to the United States Bankruptcy Court for the <u>Southern</u> District of West Virginia. The Bank opposed that referral, and the United States District Court for the Southern District of West Virginia ultimately entered an Order referring this case to this Court in the Northern District, the Court where Tara's main bankruptcy case is pending. There were no conditions or qualifications to that referral order.

In its supplemental briefing Order, this Court asked the parties to brief three additional issues:

1. What is scope of the authority of this Court to enter a final Order on the Motion in this matter?

2. If this Court does not have authority to enter a final Order on the Motion in this matter, has consent been granted, either express or implied, to this Court to do so within the scope of *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932 (2015)?

3. If this Court must make a report and recommendation in this matter, to which Court should the report and recommendation be made, the United States District Court for the Southern District of West Virginia or the United States District Court for the Northern District of West Virginia?

In its supplemental brief, Tara takes the position that this Court does not have the authority to enter a final Order in this matter and that consent has not been granted to do so, either express or implied. AP ECF 268, pp. 15-16. On the other hand, the Bank asserts that this Court has the authority to enter a final Order and that both parties have expressly and impliedly consented to final adjudication of this motion by this Court. AP ECF 269, p. 19.

Bankruptcy courts, like other federal courts, are courts of limited jurisdiction. *Canal Corp. v. Finnman* (*In re Johnson*), 960 F.2d 396, 399 (4th Cir. 1992). Due to these limitations, bankruptcy courts "must be alert to avoid overstepping their limited grants of jurisdiction." *McCorkle v. First Pa. Banking & Trust Co.*, 459 F.2d 243, 244 n.1 (4th Cir. 1972). Only the Constitution and federal statutes can confer subject matter jurisdiction on the federal courts. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675 (1994). Bankruptcy subject matter jurisdiction is granted to the district courts under 28 U.S.C. § 1334. The bankruptcy court's statutory authority to hear and determine matters is set forth in 28 U.S.C. § 157.[6] Consistent with Section 157 and by its Amended Standing Order of Reference dated April 2, 2013, the United States District Court for the Northern District of West Virginia has referred to the bankruptcy court (1) proceedings "arising in" a case under the Bankruptcy Code, (2) proceedings "arising under" the Bankruptcy Code and (3) proceedings that are "related to" a case under the Bankruptcy Code. *See* 28 U.S.C. § 1334(b). The Court assesses below those matters as applicable to the case at hand, and nothing in the order of reference from the United States District Court for the Southern District of West Virginia changes that.

---

[6] As Judge Kahn succinctly stated in *Harvey v. Dambowsky* (*In re Dambowsky)*, 526 B.R. 590, 595 (Bankr. M.D. N.C. 2015),

> Section 157 is not jurisdictional, but simply allocates the statutory authority to enter final judgments between the bankruptcy court and the district court. *Stern v. Marshall,* 564 U.S. 462, 131 S.Ct. 2594, 2606–07, 180 L.Ed.2d 475 (2011). The bankruptcy courts' constitutional powers, in turn, are governed by the scope of power conferred upon Congress under the Bankruptcy Clause of the United States Constitution, Article I, Section 8, Clause 4 ("The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States. . . . "), and the scope of authority allocated by and between tribunals created under Articles I and III of the United States Constitution, each as applied and interpreted by the opinions of the United States Supreme Court. Therefore, in order for a bankruptcy court to hear and determine any matter, it must have subject matter jurisdiction under 28 U.S.C. § 1334, statutory authority under 28 U.S.C. § 157, and constitutional authority.

I. <u>Matters Arising Under Title 11 or Arising In a Case Under Title 11</u>

Claims are deemed to "arise under" the Bankruptcy Code if they "clearly invoke substantive rights created by bankruptcy law." *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 70 (2d Cir. 2002). In other words, "arising under" jurisdiction in bankruptcy extends to "only those cases in which a well-pleaded complaint establishes either that federal [bankruptcy] law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal [bankruptcy] law." *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Tr. for Southern Cal.*, 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2856 (1983). Here, the two remaining counts are both grounded in West Virginia state law, not the Bankruptcy Code. The Court finds that the Bankruptcy Code did not create the causes of action and Tara's right to relief does not depend on a question of bankruptcy law. Therefore, the remaining counts do not "arise under" the Bankruptcy Code.

Nor do they otherwise "arise in" bankruptcy. Controversies are deemed to "arise in" bankruptcy when they "have no existence outside of the bankruptcy." *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552, 556 (3d Cir. 1999). With respect to "arising in" jurisdiction, the Court of Appeals for the Fourth Circuit stated:

> A proceeding or claim "arising in" Title 11 is one that is "'not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy.'" . . . Therefore, a "'controversy arises in Title 11' when 'it would have no practical existence *but for* the bankruptcy.'"

*Valley Historic Ltd. P'ship. v. Bank of New York*, 486 F.3d 831, 835 (4th Cir. 2007) (quoting *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003)). Chronology indicates that this action was originally filed in the United States District Court for the Southern District of West Virginia, and the counterclaim was presented there as well. The counterclaim pending here — clearly

asserted antecedent to the bankruptcy—has an independent practical existence outside of title 11. Addressing this issue in *Valley Historic*, the Court of Appeals for the Fourth Circuit observed: "It seems self-evident that a claim . . . that pre-dates the filing of the Chapter 11 case cannot be said to have arisen within that case, and whether it caused the bankruptcy is immaterial." 486 F.3d at 836. This Court finds such logic persuasive and concludes that the litigation claims in this matter filed pre-bankruptcy did not "arise in" in title 11. As the counterclaim does not "arise under" or "arise in" title 11, it is not a "core" proceeding.

    II.    <u>"Related to" Jurisdiction</u>

Non-core matters are those which may otherwise be brought in a different forum, but which are "related to" a bankruptcy case. *Dunmore v. United States*, 358 F.3d 1107, 1114–5 (9th Cir. 2004). "Non-core proceedings include the broader universe of all proceedings that are not core proceedings but are nevertheless 'related to' a bankruptcy case." *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999). Without "core" jurisdiction, the instant controversy hinges on whether the Court finds it has "related to" subject matter jurisdiction.

The Fourth Circuit has adopted the *Pacor* test for determining whether a matter is sufficiently "related to" the bankruptcy case to create subject matter jurisdiction. The test is:

> whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. . . . An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis in original).[7] The Supreme Court has upheld *Pacor's* "related to" jurisdictional test, and in an instructive footnote explained:

---

[7] Although the Supreme Court has overturned *Pacor* in part, *see Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 116 S.Ct. 494 (1995) (overruling *Pacor*'s holding that the prohibition against review of a remand order in 28 U.S.C. § 1447(d) is not applicable in a bankruptcy case), the Court has not disturbed *Pacor'*s "related to"

9

"[p]roceedings 'related to' the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, n.5, 115 S.Ct. 1493 (1995). The matter before the Court is a cause of action owned by the Debtor, Tara, which became property of the estate pursuant to Section 541.[8]

In *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932 (2015), the Supreme Court held that bankruptcy courts may adjudicate claims for which litigants are constitutionally entitled to an Article III court's adjudication, with the parties' consent. *Wellness*, 575 U.S. at 669. The Supreme Court in *Wellness* adopted the consent standard from *Roell v. Withrow*, 538 U.S. 580, 123 S.Ct. 1696 (2003), dealing with consent to proceed before a magistrate judge; thus a litigant's consent, whether express or implied, must be knowing and voluntary. 135 S.Ct. at 1948. "The 'key inquiry' under this standard is 'whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator.' *Id.*" *MDC Innovations, LLC v. Hall*, 726 F. App'x 168, 172 (4th Cir. 2018). Absent the consent of the parties, the Court is statutorily required to make a report and recommendation to the District Court, as opposed to entering a final judgment. 28 U.S.C. § 157(c)(1); *Hackman v. Fountain Grp. Co. of Utah, Inc. (In re Hackman)*, No. 10-17176-BFK, 2013 WL 343714, at *1 (Bankr. E.D. Va. Jan. 29, 2013).

In this case, consent is given. Tara chose to and did ask the District Court to refer this adversary proceeding to this Court, expressly consenting to the bankruptcy court's jurisdiction

---

jurisdictional test. *See Brooks v. U.S. Dep't of Housing and Urban Dev. (In re Brooks),* No. 17-70665, 2017 WL 6016297, at *3 (Bankr. W.D. Va. Dec. 4, 2017).

[8] Indeed, the cause of action against the Bank was reflected on the Debtor's schedules filed shortly after the case was filed. *See* Bankr. ECF 72.

10

over its claims. In that same filing, without qualification, Tara argued that proceedings like this adversary proceeding, which are related to the bankruptcy case, should be "referred to the bankruptcy court for disposition." (Dist. Ct. Dkt. ECF 55). Likewise, the Bank has expressly consented. Tara recently moved to withdraw the reference to this Court – which it originally asked for – for the purpose of conducting a jury trial. AP ECF 215. In its opposition to that motion, the Bank argued that the withdrawal motion should be denied and the adversary proceeding remain with the bankruptcy court, again without qualification, thereby expressly consenting to the bankruptcy court entering a final order on this claim.[9] AP ECF 234.

Implied consent is likewise found. As to Tara, in the withdrawal motion, Tara sought only to withdraw this matter to the District Court for the limited purpose of trial. Implicit in that motion is its consent to matters other than trial remaining in this Court, a contention it confirmed at oral argument before this Court. Moreover, Tara briefed and fully argued against the motion for summary judgment in this Court without raising a challenge to the Court's ability to issue a final order until the Court posed the question after argument. Despite confirming its express consent, the Bank likewise impliedly consented by filing, briefing, and arguing the summary judgment motion before the Court without ever challenging the Court's ability to enter a final order disposing of it.[10] The Order implementing this Memorandum Opinion is a final order.

---

[9] In its supplemental brief, the Bank reaffirmed its consent to the final adjudication of the summary judgment motion. Bank's Supp. Brief, AP ECF 269, p. 19.

[10] Because the Court finds no material facts are in genuine dispute, and that the Bank is entitled to judgment as a matter of law, this matter is further appropriate for a final order. Consistent with *Executive Benefits Ins. Agency v. Arkison,* 573 U.S. 25, 134 S.Ct. 2165 (2014), if this matter is appealed, Tara will receive a *de novo* review from an Article III Court. "In short, even if EBIA is correct that the Bankruptcy Court's entry of judgment was invalid, the District Court's *de novo* review and entry of its own valid final judgment cured any error. Cf. *Carter v. Kubler,* 320 U.S. 243, 248, 64 S.Ct. 1, 88 L.Ed.26 (1943) (bankruptcy commissioner's error was cured after the District Court 'made an independent and complete review of the conflicting evidence')." *Arkison,* 573 U.S. at 40, 134 S.Ct. at 2175.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, applicable in adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the movant bears the initial burden of showing that no material issues of fact exist. *Wachovia Bank, N.A. v. Commonwealth Sprinkler Co., Inc. (In re Commonwealth Sprinkler Co., Inc.)*, 296 B.R. 694, 699 (Bankr. E.D. Va. 2001). Once the movant demonstrates that no genuine issues of material fact exist, the burden shifts to the party opposing summary judgment to establish that questions of fact do exist. *See Comerica Bank, N.A. v. Weinhardt (In re Weinhardt)*, 156 B.R. 677, 679 (Bankr. M.D. Fla. 1993). Ultimately, the Court must then view the evidence presented in a light most favorable to the nonmoving party. *See Interim Inv. Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D. N.C. 1988), aff'd 914 F.2d 1491 (4th Cir. 1990).

## CONCLUSIONS OF LAW

"In West Virginia, the general rule holds that when a lender breaches its contract with a borrower causing economic loss . . . the borrower's primary remedy is to pursue a breach of contract action against the lender." *White v. AAMG Const. Lending Ctr.*, 226 W.Va. 339, 346, 700 S.E.2d 791, 798 (2010). Here, Tara's breach of contract claim is already dismissed.[11] Tara's breach of fiduciary duty claim survived the motion to dismiss. West Virginia law allows a tort claim (that extends beyond the contract) for economic losses when then there is evidence of a "special relationship" between the plaintiff and the defendant. *See Aikens v. Debow*, 208

---

[11] The Court dismissed Tara's breach of contract claim observing "[t]he Loan Agreement's description of the Movants' [Bank's] duties prevails over the Debtor's contrary characterization." AP ECF 117, p.7.

W.Va. 486, 500, 541 S.E.2d 576, 590 (2000) ("[W]here a special and narrowly defined relationship can be established between the tortfeasor and a plaintiff who was deprived of an economic benefit, the tortfeasor can be held liable. In cases of that nature, the duty exists because of the special relationship.").

Tara has pursued such a tort claim here. In cases where a fiduciary relationship has been found, the lender "has created a special relationship by performing extraordinary services." *Fluharty, Tr. of Ests. of Johnson v. Peoples Bank, NA*, No. 3:17-4220, 2018 WL 10593642, at *9 (S.D. W.Va. Sept. 17, 2018). This is a high hurdle to clear as "the law does not generally recognize a fiduciary relation between creditor and debtor." *Id.*

"In West Virginia, the required elements of a cause of action for breach of a fiduciary duty are three-fold: (1) existence of the fiduciary relationship, (2) its breach, and (3) damage proximately caused by the breach." *Wittenberg v. First Indep. Mortg. Co.*, No. 3:10-cv-58, 2011 WL 1357483, at *17 (N.D. W.Va. Apr. 11, 2011). Logically it follows that if there was no fiduciary relationship, then the Bank could not have breached any fiduciary duty to Tara. Therefore, the Court begins its analysis by assessing under West Virginia law whether a special relationship existed between the parties forming a fiduciary relationship.[12]

I. Special Relationship

Whether or not such a special relationship exists must be determined on a case-by-case basis.[13] *See Glascock v. City National Bank of W.Va.*, 213 W.Va. 61, 576 S.E.2d 540, 546

---

[12] There was a dispute over choice of law at the motion to dismiss stage. The Loan Agreement contains a New York choice of law provision. The Court ruled that New York law is to govern the breach of contract claims, and the remaining tort claims are analyzed under West Virginia law. *See* AP ECF 117, p. 8, n.2.

[13] Some instances where a special relationship has been found to exist in West Virginia are: (i) in the context of a construction loan agreement, a "special relationship" between the borrower and lender can arise if the lender maintains oversight of, or intervenes in, the quality of the construction process, and then fails to disclose information to the borrower about the quality of the construction project when it is foreseeable that the borrower would be injured. *Glascock v. City Nat'l Bank of West Virginia.*, 213 W.Va. 61, 576 S.E.2d 540 (2002); (ii) a "design

13

(2002). In *Aikens*, the Supreme Court of Appeals of West Virginia set forth the following guidelines for assessing whether a special relationship exists:

> The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus.

541 S.E.2d at 589. The Court will apply these guidelines to the instant lending relationship. Of particular interest are any ancillary services the Bank may have provided Tara, or any critical information it may have withheld.

Tara contends the Bank's intervention, control, and oversight of, among other things, the Capital Expenditure funds, evidences a special relationship that created a fiduciary duty.[14] Tara's theory is that by not disbursing the Capital Expenditure funds for the bridge repair, the Bank failed "to maintain the premises in a reasonably functional commercial condition [which] was a breach of their obligations." AP ECF 72, p. 7. Tara alleges that such conduct was intentional, willful, and wanton. *Id.* The Bank denies that a special relationship existed and asserts it owed no fiduciary duty as a matter of law.

---

professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the contractor and the design professional, due to the special relationship that exists between the two." Syl. pt. 6, *Eastern Steel Constructors, Inc. v. City of Salem*, 209 W.Va. 392, 549 S.E.2d 266 (2001); and (iii) a contractor was found to owe a duty of care to subsequent purchasers of a house that he constructed where rainfall caused the house to flood four years after its construction. *Sewell v. Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988).

[14] "The fiduciary duty is a duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person. It is the highest standard of duty implied by law." *Elmore v. State Farm Mut. Auto. Ins. Co.*, 202 W.Va. 430, 435, 504 S.E.2d 893, 898 (1998).

Tara's argument concentrates on two aspects of the lending relationship. First, Tara alleges the standardized cash management process formed a special relationship. The record shows that Tara controlled the day-to-day operations of the Crossings Mall, while Wells Fargo collected the money and allocated it into subaccounts. Tara highlights Wells Fargo's control of the money but discounts its own involvement. For example, Mr. Abruzzino and his agents managed the Crossings Mall's operations with a staff of eight to ten employees. AP ECF 220, Ex. O, p. 61. This included managing tenants and negotiating leases. *Id*. at 74. Notably, Tara assigned its rights in the Crossings Mall leases to the Bank but did not delegate its duties. The ALR expressly provided: "[t]his Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender." AP ECF 72-1, ALR, Section 4.1, p. 217.

As master servicer of the loan, Wells Fargo was the primary interface with the borrower and could perform a variety of administrative functions. AP ECF 220, Ex. M, p. 33. This included collecting payments, sending out billing statements, conducting escrow analyses, and reviewing disbursements requests. *Id.* at 33-34. Wells Fargo was also obligated to periodically inspect the property under the pooling and servicing agreement. AP ECF 220, Ex. L, p. 23. Upon review of the record, the Court echoes the holding in *Arthur-Nelson v. United States Bancorp Gov't Leasing & Fin. Inc.*, where certain Crossings Mall tenants sued the defendants under similar contract and tort theories: "It can hardly be said, based upon the terms of the ALR, that the Defendants stepped into the Debtor's shoes regarding the ownership and maintenance of The Crossings Mall." No. 1:19CV167, 2020 WL 5822211 (N.D. W.Va. Sept. 30, 2020). The

Court finds, based on the facts advanced by Tara, that the cash management process did not create a special relationship.[15]

Second, Tara alleges that Wells Fargo withheld necessary information—a Y Hold placed on Tara's account—that caused Tara harm.  The uncontroverted facts establish that a Y Hold is Wells Fargo's internal notation flagging the account for heightened monitoring, similar to a risk grade increase.[16]  Wells Fargo placed the Y Hold on Tara due to the bank's assessment the account needed additional monitoring.  Tara likens this to *Glascock*, arguing that Wells Fargo withheld critical information.  In *Glascock*, the lender did not disclose to the borrowers a home inspection report that revealed multiple structural defects.  213 W.Va. 61, 576 S.E.2d 540 (2002).  Without this critical information, the borrowers converted a six-month construction loan into a more traditional 30-year loan at a higher interest rate.  *Id.*

Tara's equating this to the Y Hold is misplaced.  The placement of a Y Hold on an account is not critical information.  It does not freeze the borrower's account as Tara alleges.  Rather, the Y Hold goes back to the Bank's desire to flag this account for additional monitoring.  *See* AP ECF 220, Ex. L, p. 76.  In communications regarding the matter, Wells Fargo was bluntly clear with Tara.  For example, on June 10, 2016, Wells Fargo managing director, Carrie Booker, emailed Dario Campelo, the accounting manager at Gold Coast Partners: "I am requesting the actual financials based on actual cash received/cash utilized for operations.  The requirement for quarterly, unaudited financials has always been a requirement per the Section

---

[15] Moreover, the Court notes that the relationship was highly typical for a CMBS loan and both parties were well acquainted with the details.  In fact, Wells Fargo has an entire department devoted to CMBS loans.  AP ECF 220, Ex. L, p. 53.  Nor was this Mr. Abruzzino's first exposure to CMBS lending: this was his *third* CMBS loan.  AP ECF 220, Ex. O, p. 56.

[16] Per Ms. Booker, a Y Hold "is a code that we -- we put on loans that the asset manager deems to require additional monitoring, that we would like to be involved in every disbursement on the loan."  AP ECF 220, Ex. L, p. 82.

16

4.1.6 below within the Loan Agreement." AP ECF 238-29. Tara acknowledged Wells Fargo's request, but did not deliver the financial statements.[17] As a result, the funds were not released before the flood occurred. The Court is unpersuaded that Wells Fargo withheld essential information or otherwise "strung along" Tara by not disclosing a Y Hold placed on their account. Tara knew the documents it needed to produce to access the Capital Expenditure funds but did not provide them. Simply put, Wells Fargo acted within its rights and in accordance with the Loan Agreement reviewing the disbursement request.[18]

While West Virginia caselaw recognizes special relationships in limited circumstances, nothing on the record appears unusual or special about this one. Tara has directed the Court to no facts indicating how Tara was adversely affected from "society in general." *Aikens*, 208 W.Va. at 589; *See also White*, 226 W.Va. at 348, 700 S.E.2d at 800 ("Furthermore, the plaintiff in the instant case has directed us to no facts indicating how the plaintiff was affected differently from society in general, or how the Bank had a specific reason to know of any tort damages or consequences likely to be suffered by the plaintiff above, beyond or different from her losses caused by the alleged breach of contract."). The record also does not indicate that Tara has proven any facts that the Bank performed ancillary or extraordinary services for Tara outside its contractual obligations. Therefore, the Court finds that no special relationship existed, and no fiduciary duty was breached. The Court grants the Bank summary judgment on Count III.[19]

---

[17] *See* June 10, 2016 email from Dario Campelo to Carrie Booker: "Our auditor is working on 4Q 2015 and 1Q 2016 to resolve our Default." AP ECF 238-29.

[18] Ms. Booker's August 2020 deposition reiterates Wells Fargo's reasoning: "the funds were not released in January of 2016 because there were other open matters that had been brought up previously and communicated to the borrower that prior to releasing the funds answers to my questions needed to be provided." AP ECF 220, Ex. L, p. 153.

[19] In its Amended Answer, Tara takes the position that "Defendant affirmatively states that this bridge and culvert are located on property belonging to the State of West Virginia, Division of Highways." Further, Tara states ". . . the bridge and culvert are located in, over, and upon the West Virginia Division of Highway's right of way in

II.     Accounting

This Court agrees with Judge Flatley's analysis that the existence of a fiduciary or trust relationship is an essential element of an accounting claim. AP ECF 117, p. 11.[20] Since the Court has already ruled that a fiduciary relationship did not exist here, no right to an accounting exists. The Court grants the Bank summary judgment on Count VI.

## CONCLUSION

For all of the above reasons, the Bank's motion for summary judgment is granted. A separate Order will be entered contemporaneously herewith.

---

connection with County Route 45." AP ECF 28, ¶¶1, 17. The right to decide if, when and how public roads are repaired in a West Virginia city resides exclusively in the municipality to which the State has delegated authority. *City of Benwood v. Interstate Bridge Co.*, 30 F. Supp. 952 (N.D. W.Va. 1940). The law appears no different on a county road as to the state. Under the rule of judicial admissions, "a party is bound by the admissions of his pleadings." *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989). A judicial admission is a "representation that is 'conclusive in the case'" such as "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (citing *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264 (4th Cir. 2004)). Because the Court finds there was no special relationship between the parties, the Court need not address the argument that the repairs requested to be made were on state property that Tara did not own and that did not constitute a part of the Bank's collateral. Additionally, as the Court finds that there is no special relationship between the parties, the Court need not address the assertion that the claim is barred by a contractual liability limitation which precludes Tara from recovering money damages in connection with a claim of this type, nor does the Court need to reach the issue of causation.

[20] It also appears that the parties agree with Judge Flatley's analysis. In its initial brief, the Bank asserts that Tara "cannot prove the essential elements of its claim for an accounting. Specifically, Plaintiff cannot prove: (i) that Defendants and Plaintiff have the type of 'special relationship' that is required to prevail on an accounting claim." AP ECF 220, p. 3. In its reply brief, without making further argument, Tara states that "the Movants appear to acknowledge the governing analysis is the same as the discussion of the existence of the special relationship." AP ECF 236, p. 35.

18